UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM ROGER WILKINSON,<br><br>Defendant. | Case No. 1:14-cr-168-BLW-1<br><br>**MEMORANDUM DECISION AND ORDER RE MOTIONS IN LIMINE** |

Pending before the Court are six motions in limine. Dkts. 79, 82, 84, 86, 88, and 91. The motions are fully briefed and at issue, and the Court finds that a hearing would not materially aid in resolving the motions. For the reasons explained below, the Court will grant in part and deny in part the motions, without prejudice to the rights of the parties to raise these objections at trial. While some rulings must await trial, this decision should give counsel some insight into the Court's approach as to these issues.

## BACKGROUND

The factual background of this case has been discussed in detail in previous orders and will not be discussed in detail here. *See* Dkts. 69, 77. Particularly relevant to the

pending motions, though, are the nature of the charges filed against Defendant William Wilkinson.

In a Second Superseding Indictment ("Indictment"), Wilkinson was charged with six counts: three counts of sexual exploitation of a child in violation of 18 U.S.C. § 2251(a), one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), one count of access with intent to view child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), and one count of transportation of child pornography in violation of 18 U.S.C. § 2252A(a)(1).[1] Count One alleges that on or about November 3, 2012, Wilkinson knowingly coerced his ex-girlfriend's young daughter, H.H., to engage in sexually explicit conduct for the purpose of producing a visual depiction of that conduct. Dkt. 36, p. 2. Count Two alleges that on or about December 9, 2012, Wilkinson again produced a visual depiction of H.H. engaged in sexually explicit conduct. Count Three alleges that on or about March 3, 2013, Wilkinson again produced a visual depiction of H.H. engaging in sexually explicit conduct; specifically, "a series of several hundred sequential images depicting Wilkinson and H.H. engaging in sexually explicit conduct." *Id.* at p. 3. Count Four alleges that on or around May 24, 2013, Wilkinson knowingly possessed one or more visual depictions of H.H. engaged in sexually explicit conduct that were produced on or about November 3, 2012 and December 9, 2012. *Id.* Count Five alleges that between June 6, 2013, and October 28, 2013, Wilkinson knowingly accessed images of child pornography. *Id.* p. 4.

---

[1] Count Six, transportation of child pornography, was dismissed upon motion of the Government pursuant to a Docket Entry Order filed on October 14, 2015. Dkt. 100.

**Memorandum Decision and Order - 2**

Trial in this matter is currently set for October 23, 2015.

## ANALYSIS

The Defendant has filed one motion in limine (Dkt. 82) in which he requests a *Daubert* hearing. The Government has filed the remaining five motions in limine, seeking to admit various evidence at trial. Each motion will be discussed in turn.

### 1.  Wilkinson's Motion and Request for *Daubert/Kumho Tire* Hearing

In his Motion in Limine and Request for *Daubert/Kumho Tire* Hearing, Wilkinson asks the Court to exclude the testimony of counselor Mydell Yeager. Dkt. 82, p. 1. Alternatively, Wilkinson requests that the Court require the Government to establish the testimony's reliability through an evidentiary hearing. *Id*. p. 14. The Government intends to have Ms. Yeager testify regarding the following:

(1) The dynamics of child sexual abuse and the general emotional and behavioral characteristics of sexual abuse victims and offenders;

(2) The distinct phases of sexual abuse, the effects of 'grooming' on a sexual abuse victim, and the dynamics of the victim/offender relationship; and

(3)  Why victims often delay disclosing sexual abuse, deny sexual abuse, and/or suppress sexual abuse.

*Id*. at p. 2, citing the Government's Expert Disclosure. Crucial to the Court's analysis is that the Government wishes to call Ms. Yeager only on rebuttal. The Government is not seeking to admit Ms. Yeager's testimony as direct evidence of Wilkinson's guilt based upon his behavioral patterns. Rather, Ms. Yeager will seek to counter any explicit or

implied argument that H.H.'s testimony should not be believed because she delayed in reporting the abuse, or did not report it consistently.

Wilkinson argues that the effect—intended or otherwise—of Ms. Yeager's testimony will be to improperly bolster the credibility of H.H. and her testimony. Wilkinson has objected to Ms. Yeager's expected testimony arguing that such testimony has not been demonstrated as sufficiently reliable under FRE 702. *Id*. pp. 4, 8. Alternatively, Wilkinson argues that Ms. Yeager's testimony is irrelevant or unfairly prejudicial and thus precluded under Rules 402 and 403. *Id*. at pp. 7, 8.

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court held that Federal Rule of Evidence 702[2] requires a trial court to act as "gatekeeper" and "ensure that any and all scientific testimony . . . is not only relevant, but reliable." 509 U.S. 579, 589 (1993). Following this holding, a debate ensued regarding whether *Daubert* imposed the gatekeeping obligation on trial courts only with regard to scientific testimony, or to nonscientific expert testimony as well. The Supreme Court resolved the debate in *Kumho Tire Co., Ltd. v. Carmichael*, where it determined that a court's "basic gatekeeping

---

[2] FRE 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

obligation . . . applies to all expert testimony." 536, U.S. 137, 147 (1999). In determining the admissibility of an expert's testimony, the court may consider the so-called *Daubert* factors: (1) whether a "theory or technique . . . can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication"; (3) whether, with respect to a certain technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Daubert*, 509 U.S. at 592–94. However, these factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his [or her] testimony." *Kumho Tire*, 526 U.S. at 150.

Rather than adhere to a stringent factor-based test, a trial court may deploy a flexible approach to uphold the purpose of the gatekeeping function. That is, the court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. Importantly, a trial court has "considerable leeway" "in deciding *how* to test an expert's reliability"— whether, for example, special briefing or other proceedings are needed to investigate reliability—as well as in deciding the ultimate question: that is, whether the testimony is reliable. *Id.*

In support of its argument that no evidentiary hearing is necessary and that Ms. Yeager's testimony is admissible, the Government points primarily to *U.S. v.*

*Bighead*, 128 F.3d 1329, (9th Cir. 1997) (per curiam).[3] There, the Ninth Circuit found the district court did not error in allowing a psychologist to testify regarding child sexual abuse and in particular, "delayed disclosure," "script memory" and other "general behavioral characteristics" of alleged victims of child sexual abuse. *Id*. 128 F.3d at 1331. The psychologist's testimony was not subject to any *Daubert* analysis because her testimony was based on her "professional experience" and did not rely on any "novel scientific technique" or employ "any special techniques or models." *Id*. Notably though, this decision was issued prior to *Kumho Tire*.[4]

In light of *Kumho Tire*, the Court concludes that it would be error to rely solely on *Bighead* and forego a *Daubert* analysis simply because Ms. Yeager's testimony is based on her professional experience as opposed to a novel, scientific technique. Indeed, a contrary conclusion would allow an expert to escape scrutiny when her testimony is

---

[3] The Government also points the Court to two unpublished Ninth Circuit decisions. These decisions were post-*Kumho*, and both cite favorably to *U.S. v. Bighead*. In *United States v. Nation*, 543 Fed.Appx. 677, 678 (9th Cir. 2013), the Ninth Circuit held that the district court did not abuse its discretion in admitting the rebuttal testimony of an FBI Child and Adolescent Forensic Interviewer when the defense "implicitly, but repeatedly, attacked the victims' credibility based on their failure to reveal the abuse at or near the time it occurred." Similarly, in *United States v. Young*, 2015 WL 4930218 (9th Cir. 2015), the Ninth Circuit found the district court did not commit reversible error in allowing a forensic interviewer's testimony regarding the "general behavioral characteristics" of child sexual-abuse victims after the defense had attacked the victims' credibility based on their delayed and incomplete reports of the abuse. Pursuant to Ninth Circuit Rule 36-3, however, these unpublished decisions have no precedential value. Moreover, in *Nation*, it is unclear whether the district court did or did not analyze the experts' testimony under *Daubert*. And in *Young*, the Circuit held that the district court's failure to make explicit relevance and reliability findings was harmless if it was in error at all. Nothing about these cases suggests that the Court can forego a *Daubert* analysis altogether.

[4] In a spirited dissent, Judge Noonan argued that the Government had read *Daubert* too narrowly in arguing that it applied only to "novel scientific evidence[,]" not "other specialized knowledge based upon training and experience." *Id*. at 1335.

based on experience as opposed to an accepted methodology. *Kumho Tire* makes clear that a trial court's "basic gatekeeping obligation . . . applies to all expert testimony" and that distinguishing between nonscientific and scientific testimony is not only difficult conceptually, but unnecessary. As such, the Court will examine whether the proffered testimony satisfies the requirements of Rule 702, using both *Daubert* and *Kumho Tire* as its guideposts.

The first inquiry under *Daubert* is whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591. The Court concludes that Ms. Yeager's testimony is relevant and will assist the jury in understanding H.H.'s testimony. As the Government points out, "H.H.'s memory, motive, and credibility will be squarely at issue at trial." Dkt. 92, p. 2. This is because Wilkinson's admitted defense is that H.H. should not be believed. Specifically, Wilkinson alleges "that H.H. fabricated the allegations of sexual abuse as a result of the 2012 court order granting the Defendant monthly visitation with her." Dkt. 90, p. 9.

The second inquiry is whether the testimony is reliable. In order to make this determination, the Court needs additional information and will hold an evidentiary hearing as to this narrow issue. Prior to that hearing, the Court offers the following guidance.

In support of its argument, the Government states that Ms. Yeager's testimony will be based on her more than 33 years of experience, and her counseling of over 3,000

sexual abuse victims.[5] Dkt. 92, p. 3. Admittedly, Ms. Yeager "has not employed any novel scientific techniques and methods, and her testimony is not based upon specific studies or other scientific proof." *Id.* Ms. Yeager is therefore basing her testimony on her years of experience. But the Government's unsupported statements in a brief regarding that experience are insufficient to establish reliability under Rule 702. After all, "a trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed.R.Ev. 702 Adv. Comm. Notes; *citing Daubert v. Merrell Dow Pharmaceuticals Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) (("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough."). While a trial court should consider the *Daubert* factors "where they are reasonable measures of the reliability of expert testimony[,]" those factors are not always applicable. With respect to non-scientific expert testimony in particular, the reliability of an expert's methodology must be determined by common sense and common practices in the area of expertise in question. As the Advisory Committee Notes make clear, experience alone, or in conjunction with other knowledge, skill, training, or education, may very well provide a sufficient foundation for expert testimony. Fed.R.Evid. 702 Adv. Comm. Notes. However, if a witness relies "solely or primarily on experience, [she] must

---

[5] The Court acknowledges that the Idaho Court of Appeals has determined that "evidence offered by the state at trial . . . demonstrated that Yeager was qualified to testify concerning the general behavior and emotional characteristics of victims and offenders in child sexual abuse cases, including the subject of delayed disclosure." *State v. Dutt*, 139 Idaho 99, 104–05, 73 P.3d 112, 117–18 (Ct. App. 2003). This holding does not, however, obviate the need for this Court to conduct its own inquiry or relieve the Government of its burden to demonstrate reliability in this case. In addition to characteristics of victims and offenders and delayed disclosure, Ms. Yeager is also expected to testify here about "the effects of 'grooming' on a sexual abuse victim, and the dynamics of the victim/offender relationship." The Court needs to ensure that testimony on all proposed topics is reliable.

**Memorandum Decision and Order - 8**

explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id. See also Kumho Tire*, 119 S.Ct. at 1176 ("[I]t will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.").

Finally, in balancing the probative value and the prejudicial effect of Ms. Yeager's testimony, the Court finds that its probative value is not substantially outweighed by its prejudicial effect. The testimony has significant probative value in that it may "rehabilitate . . . without vouching for . . ." H.H.'s credibility after she is cross-examined. *Bighead*, 128 F.3d 1331. Risk of unfair prejudice is low because Ms. Yeager has no knowledge of the facts of the case and will not testify that H.H. fits the description of a sex abuse victim, or that Wilkinson behaves like a child molester. Accordingly, if the Government meets its burden at the *Daubert* hearing and establishes reliability, the testimony will be admissible.

### 2. The Government's Motions to Admit Other Acts Evidence

In its motions to admit "other acts" evidence (Dkt. 79, 88) the Government seeks to admit evidence at trial that can fall within one of three categories: (1) other acts of "child molestation" as defined in Rule 414; (2) other acts that do not constitute "child molestation" as defined but are nonetheless sexually charged acts directed at minors; and (3) four printed pages of computer-generated images (CGI) depicting incest. The Government submits that this evidence is admissible in any one of three ways: via Rule

414, 404(b), or as evidence "inextricably intertwined" with direct evidence that proves Wilkinson's guilt. Each category will be discussed in turn.

   a.   Other acts of "child molestation" under Rule 414

Generally, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed.R.Evid. 404(b). But this rule is not without exception. Rule 414(a) states that "[i]n a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant." Fed.R.Evid. 414(a). Under this rule, "the key to admissibility is relevance, and no independent evidence of the commission of the prior bad act is required." *U.S. v. Norris*, 428 F.3d 907, 913 (9th Cir. 2005); *see also See United States v. LeMay*, 260 F.3d 1018, 1026 (9th Cir.2001) (holding that the admission of propensity evidence under Rule 414 presents no constitutional violation when the evidence is relevant, probative, and not outweighed by its prejudicial effect).

Rule 414 applies only when the charged offense and the prior bad acts that the Government seeks to introduce are offenses of "child molestation" as defined by the Rule. Relevant here, "child molestation" includes the following:

> a crime under federal law or under state law (as "state" is defined in section 18 U.S.C. § 513) involving:
>
> . . . . .
>
> (B) any conduct prohibited by 18 U.S.C. chapter 110;

(C) contact between any part of the defendant's body—or an object—and a child's genitals or anus;

(D)   contact between the defendant's genitals and any part of a child's body;

. . . . .

(F) an attempt . . . to engage in conduct described in paragraphs (A)-(E).

Fed.R.Evid. 414(d).

The Indictment charges Wilkinson with three counts of sexual exploitation of H.H., one count of possession of child pornography, and one count of access and intent to view child pornography. As Wilkinson acknowledges, all of these offenses are found within chapter 110, Title 18, United States Code. *See* Dkt. 95, p. 5. As such, for the purposes of Rule 414, Wilkinson is charged with offenses of "child molestation." Therefore, "evidence of [his] commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant." Fed.R.Evid. 414(a).

The next question then becomes whether the evidence proffered by the Government is evidence of Wilkinson's commission of other "offenses of child molestation." The Court concludes that some conduct qualifies as "child molestation" as defined in Rule 414, while some does not, as further explained below.

With respect to H.H.'s testimony, she is expected to testify in part that Wilkinson:

(1) "committed acts of sexual abuse with [her] including genital-genital, genital-oral, anal-genital, and manual-genital contact";

(2) "sexually abused [her] while on trips to California and Las Vegas";

**Memorandum Decision and Order - 11**

(3) "used the sex toys and lubricant as part of the abuse"

(4) "took pictures of [her] with her underwear off while she was changing";

(5) made a sexually explicit video of [her]; and

(6) "made [her] watch pornographic movies with both adults and children in them[.]"

Dkt. 79, pp. 4–5. The Court concludes that the above acts are "offenses of child molestation."[6]

By way of explanation, numbers one through three fall within the ambit of Rule 414(d)(2)(C) or (D), which defines child molestation as contact between the defendant— or an object—and the child's genitals, or contact between the defendant's genitals and the child. Numbers four through six above fall under Rule 414(d)(2)(B), which defines child molestation as "any conduct proscribed by chapter 110 of title 18, United States Code." Specifically, and with regard to numbers four and five, Title 18, Section 2251(a) prohibits any person from coercing any minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct. 18 U.S.C. 2251(a). And, with regard to number six, Title 18, Section 2252 prohibits a person from knowingly possessing visual depictions of a minor engaged in sexually explicit conduct. 18 U.S.C. 2252(a).[7]

---

[6] The other additional acts that the Government seeks to introduce through H.H.'s testimony will be addressed below in the context of Rule 404(b).

[7] Sections 2251 and 2252 also contain interstate commerce requirements. However, case law suggests that those interstate commerce links are not necessary when considering whether conduct constitutes offenses of "child molestation" for Rule 414 purposes. *See U.S. v. Sturm*, 2011 WL 6261657, at *9 (10th Cir. 2011). In *Sturm*, the Tenth Circuit held that "a prior state-law conviction may constitute an 'offense of child molestation' admissible under [Rule] 414(d)(2) notwithstanding the absence of a connection to interstate commerce." *Id*. at *1. It explained, "[n]othing in the Rule or legislative history (Continued)

Having determined that Wilkinson is accused of crimes involving child molestation and that the listed evidence above also involves offenses of child molestation,[8] the Court must make a determination as to whether there is a factual basis for such evidence under Rule 104(b) and whether it is admissible per Rule 403. *See LeMay*, 260 F.3d at 1026; *U.S. v. Norris*, 428 F.3d 907, 914 (9th Cir. 2005).

    1.   Factual Basis

In determining whether there is sufficient evidence to satisfy Rule 104(b), a district court "is not required to make any preliminary finding that the government has proved the conditional fact." *Norris*, 428 F.3d at 914. Instead, the court "simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence." *Id*. Here of course, the conditional facts are whether Wilkinson committed the other acts of child molestation.

---

indicates that Congress considered the interstate aspect of child pornography crimes to be relevant in this context, and Rule 414(d)(3)–(6) describes other conduct constituting an 'offense of child molestation' that plainly requires no interstate element. Thus, conduct supporting a conviction under state law may constitute an 'offense of child molestation' for Rule 414(d)(2) purposes, even though the state law offense did not involve child pornography traveling across state lines." *Id*. at * 9. Similarly, here, conduct may constitute an "offense of child molestation" for Rule 414(d)(1) purposes, even though such conduct may not have involved traveling across state lines.

    [8] Also pursuant to Rule 414, the Government seeks to admit testimony from J.V.G., a minor and friend of H.H. who stayed overnight with H.H. at Wilkinson's residence. J.V.G. is expected to testify, in part, that while staying overnight at Wilkinson's residence, she slept with H.H. and Wilkinson in his bed, and that in the morning Wilkinson "grab[bed] [her] butt" and "[tried] to massage it." The Court concludes that this is not admissible under Rule 414 because it does not necessarily constitute an "offense of child molestation." The alleged contact between Wilkinson and J.V.G. does clearly constitute contact between the genitals of J.V.G. and Wilkinson's body, or Wilkinson's genitals and J.V.G.'s body. Nor does it clearly constitute an attempt to engage in such contact. Additionally, while J.V.G. may testify that Wilkinson took photos of her and H.H. eating and playing, it is not clear that those photos are sexual in nature. As such, J.V.G's testimony will not be admitted pursuant to Rule 414, but will be analyzed below as evidence "inextricably intertwined" with direct evidence.

The Court concludes that in this case, the jury could reasonably find by a preponderance of the evidence that Wilkinson committed the other acts of child molestation listed above. Indeed, ample evidence exists: H.H.'s expected testimony at trial, H.H.'s CARES and forensic interviews, the images and video found on Wilkinson's electronic devices, and the sex toys and lubricant seized at Wilkinson's residence and identified by H.H.

### 2. Probative value versus danger of unfair prejudice

"[W]hen putting this type of evidence through the [Rule] 403 microscope, a court should pay 'careful attention to both the significant probative value and the strong prejudicial qualities' of that evidence." *Doe ex. rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1268 (9th Cir. 2000). In fact, when determining whether to admit other acts of offenses of child molestation, a trial court should evaluate several non-exclusive factors: (1) "the similarity of the prior acts to the acts charged," (2) the "closeness in time of the prior acts to the acts charged," (3) "the frequency of the prior acts," (4) the "presence or lack of intervening circumstances," and (5) "the necessity of the evidence beyond the testimonies already offered at trial." *Id.* Additionally, "the extent to which an act has been proved is a factor that district courts may consider in conducting the Rule 403 inquiry." *LeMay*, 260 F.3d at 1029. Because of "the sensitive nature of the evidence proffered, it is important that the district court fully evaluate the factors enumerated above, and others that might arise on a case-by-case basis, and make a clear record concerning its decision whether or not to admit such evidence." *Glanzer*, 232 F.3d at 1268–69.

Weighing in favor of admission are the first four factors. First, the acts involve the abuse of H.H., who is depicted in the images charged in Counts One through Three. Most

of the acts of abuse occurred at Wilkinson's residence, where those same images were taken. Second, H.H. will likely testify that the abuse occurred each time she went to Wilkinson's residence, which was at least monthly beginning in September of 2012, just three months before the images in Count One were taken. On the other hand, she may also testify that Wilkinson sexually abused her over approximately six years, which is not necessarily "close in time" with the charged acts. However, the Ninth Circuit has noted when examining Rule 414 evidence that "the lapse of twelve years does not render the decision to admit relevant evidence of similar prior acts an abuse of discretion." *LeMay*, 260 F.3d at 1029 (previously held in the context of Rule 404(b)). Additionally, factors three and four seem to counterbalance the six-year timeframe because H.H. will testify that the sexual abuse was frequent and occurred almost continuously up until her disclosure and Wilkinson's subsequent arrest.

The fifth factor appears to be the only factor weighing against admissibility. As Wilkinson acknowledges, this case "does not hinge on the testimony of the victim." Dkt. 95, p. 7. The Government will present the images in question to the jury, and H.H. will likely identify herself and Wilkinson in those images. Thus, the necessity of the evidence beyond the testimonies already offered at trial is not particularly high. However, "[p]rior acts evidence need not be absolutely necessary to the prosecution's case in order to be introduced; it must simply be helpful or practically necessary." *LeMay*, 260 F.3d at 1029.

The Court concludes—after a careful evaluation of the relevance of the evidence and the five factors above—that the evidence of other acts of child molestation are

**Memorandum Decision and Order - 15**

admissible through H.H.'s testimony. The Court will reserve ruling on how to instruct the jury regarding this evidence.

b.  Other acts not constituting "child molestation"

The Government seeks to introduce additional other acts evidence not constituting "child molestation" under Rule 414 through the testimony of H.H. and J.V.G. It argues that such evidence is admissible either as evidence "inextricably intertwined" with direct evidence, or as permissible Rule 404(b) evidence. Wilkinson disputes the admissibility of this evidence under either approach, and further challenges its admissibility under Rule 403, arguing that its unfair prejudice outweighs any probative value.

1.  "Inextricably Intertwined"

As alluded to above, the Government argues that J.V.G.'s testimony is "inextricably intertwined" with charged offenses and therefore not subject to 404(b) analysis. Wilkinson "does not dispute that evidence regarding the alleged molestation of H.H. during and around the time period covered by the charges, November 2012 through November 2013, is inextricably intertwined with the charged offenses." Dkt. 95, p. 12. But as for whether J.V.G.'s testimony should be admissible as evidence inextricably intertwined to the charged conduct, Wilkinson is silent on this score.

Generally, there are two circumstances in which a court may conclude that other act evidence is "inextricably intertwined" with the charged conduct and therefore not subject to a Rule 404(b) analysis. First, if the evidence "constitutes a part of the transaction that serves as the basis for the criminal charge." *U.S. v. Vizcarra-Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995). The Ninth Circuit has explained that "[t]he policies

underlying rule 404(b) are inapplicable when offenses committed as part of a 'single criminal episode' become other acts simply because the defendant 'is indicted for less than all of his actions.'" *Id*. (internal citations omitted). And second, such evidence is admissible when it is necessary "to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Id*. at 1012–13.

J.V.G. is expected to testify to the following:

(1)    She stayed the night with H.H. at Wilkinson's house, and in the middle of the night, H.H. and J.V.G. went to sleep with Wilkinson in his bed. Wilkinson slept on one edge of the bed, H.H. slept in the middle, and J.V.G. slept on the other edge of the bed.

(2)    In the morning, Wilkinson "woke up earlier than us," H.H. was on the edge of the bed, and J.V.G. felt "like someone was grabbing my butt," and "trying to massage it." J.V.G. is expected to testify that it was Wilkinson who grabbed her.

(3)    Wilkinson had a DVD player in his car, and H.H. and J.V.G. watched a pornographic video on it.

(4)    J.V.G. and H.H. were in a jacuzzi at Wilkinson's residence. H.H. took off her underwear to show the Defendant. "He would play around with her and mess around with her and touch her like that (gesturing towards her lap)."

(5)    Wilkinson took H.H. and J.V.G. to Target. Wilkinson purchased three or four "thongs" and said that "if anyone asks you what they are for to say they are for her mom."

(6)    H.H. and J.V.G. modeled the "thong underwear" for Wilkinson at his residence.

(7)    J.V.G. observed Wilkinson with H.H. "play around with her like carry her and get her in her butt and stuff."

(8)    Wilkinson stated to H.H. that J.V.G. "wouldn't tell her parents what movies we would watch or what we would do or what would happen."

(9)    Wilkinson used his phone to take pictures of H.H. and J.V.G. eating and playing at his residence.

**Memorandum Decision and Order - 17**

Dkt. 79, p. 6.

Notably, this overnight stay that J.V.G. is expected to testify about occurred on November 2 to November 3 of 2012. In Count One, Wilkinson is charged with producing a series of sexually explicit images of H.H. on the morning of November 3, 2012. Dkt. 79, p. 13. These images show Wilkinson sexually abusing H.H. in his bed. *Id*. Approximately two minutes before the images in Count One were taken, Wilkinson took another photo which depicts him, H.H., and J.V.G. all in his bed. *Id*. Other photos of H.H. and J.V.G. were taken on November 2 and 3, 2012 as well.

This testimony is relevant because it tends to show that Wilkinson committed the charged crimes in Counts One. Perhaps most importantly, J.V.G.'s testimony is particularly significant because it pertains to the same day and place in which the charged conduct occurred.  Taking J.V.G.'s expected testimony as true, it appears that November 2nd and 3rd of 2012 constituted a "single criminal episode" and that Wilkinson was certainly "indicted for less than all of his actions." Additionally, J.V.G.'s testimony will likely corroborate H.H.'s testimony—testimony that the defense undoubtedly plans to attack. Finally, since J.V.G.'s testimony discusses the period of time almost immediately leading up to the charged conduct—allegedly within two minutes—this evidence is part of the "coherent and comprehensible story regarding the commission of the crime."

Accordingly, J.V.G.'s testimony surrounding the circumstances leading up to the charged conduct—the taking of the photographs of H.H. on November 3, 2012—will be admitted. On the other hand, Wilkinson's acts not amounting to child molestation—as will be testified to by H.H.—do not appear to be "inextricably intertwined" with the

charged conduct.  Therefore, they will be discussed below in the context of Rule 404(b).

        2.  <u>Rule 404(b)</u>

Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed.R.Ev. 404(b). However, this evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id*. In other words, "evidence of past wrongful acts is admissible if it is relevant to an issue *other* than the defendant's character or criminal propensity." *U.S. v. Alfonso*, 759 F.2d 728, 739 (9th Cir. 1985). "Once it has been established that the evidence offered serves one of [the purposes authorized by Rule 404(b)(2) ], . . . the only conditions justifying the exclusion of the evidence are those described in Rule 403. . . ." *U.S. v. Curtin*, 489 F.3d 935, 944 (9th Cir. 2007) (en banc) (internal citations omitted).

"To be admissible under Rule 404(b), evidence of prior acts and crimes must: (i) prove a material element of the crime currently charged; (ii) show similarity between the past and charged conduct; (iii) be based on sufficient evidence; and (iv) not be too remote in time." *U.S. v. Hinton*, 31 F.3d 817, 822 (9th Cir. 1994).

It is also expected H.H. will testify that Wilkinson:

(1) "[E]xposed his naked body to H.H.";

(2) "[P]urchased thong underwear and bras for H.H. to wear";

(3) "[L]ooked at pornography on his desktop computer at home and on a laptop computer, and made H.H. watch the pornography during the Defendant's abuse.

The pornography included videos of people being struck with sticks and ropes."

(4)  "[M]ade [her] watch . . . pornography" while sexually abusing her;

(5)  Threatened H.H. with a gun, held it to her head, and told H.H. not to tell anyone about the abuse "because if you do, this will happen to your Mom" and then pretended to pull the trigger; and

(6)  Physically abused H.H.

The Court finds that statements one through four above meet the four Rule 404(b) requirements. They tend to show Wilkinson's motive, opportunity, intent, and identity with regard to Counts One through Three, and his knowledge, absence of mistake, or lack of accident with regard to Counts Four and Five. The similarity in this conduct and the charged conduct is high: same alleged victim, same alleged place. Sufficient evidence exists for this testimony, including H.H.'s statements to investigators, and during the CARES and FBI forensic interviews. Finally, the testimony is not too remote in time, since H.H. will likely testify that the abuse occurred each time she went to Wilkinson's home over a significant period of time.

This evidence is also more probative than prejudicial. As explained above, the testimony is certainly relevant to issues other than Wilkinson's criminal propensity. It may be prejudicial, but is not unfairly so. The Court will instruct the jury that it can consider this prior act evidence only for those purposes permitted by Rule 404(b).

With regard to the physical abuse and the threats made to H.H.'s mother, the Court reaches a different conclusion. This conduct is dissimilar from the conduct charged, and it is unclear when this conduct occurred or whether it was continual in nature. While the

Government argues that this information is relevant to explain why H.H. did not immediately disclose the sexual abuse, Wilkinson points out that this is not a permissible reason for admissibility under Rule 404(b). The Court agrees—if Wilkinson chooses not to attack H.H.'s credibility based on her failure to report the molestation earlier.  If, on the other hand, Wilkinson raises the issue of H.H.'s failure to report the molestation, it may be introduced to rehabilitate H.H.'s credibility.

 c. <u>Computer-generated images</u>

  Last but not least, the Government seeks to admit four pages of printed material discovered in Wilkinson's residence during the service of the May 24, 2013 search warrant. Dkt. 88, p. 2. This material does not depict real individuals, but rather, consists of computer-generated images depicting a female child and her father engaged in sexually explicit conduct. *Id*. The Government asks that this be admitted as evidence "inextricably intertwined" with direct evidence, or as permissible 404(b) evidence. Wilkinson requests a limiting instruction to the extent these images are allowed under 404(b).

  The Court agrees that this material is permissible 404(b) evidence. As the Government asserts, the material tends to show Wilkinson's motive and intent with regard to Counts One through Three, as well as his knowledge, absence of mistake, or lack of accident with regard to Count Four and Five. The evidence is similar to charged conduct, i.e. the access of child pornography, is based on sufficient evidence since testimony will be offered that the material was found in Wilkinson's suitcase in his residence, and was not too remote in time since it appears the material was accessed on

September 25, 2012. The Court will instruct the jury at trial that they are to consider such evidence only for the purposes permitted by Rule 404(b).

### (3)  The Government's Motion to Admit Recordings

In its motion in limine to admit recordings (Dkt. 86), the Government seeks a ruling from the Court that two separate interviews of H.H. are admissible: the May 22, 2013 CARES interview conducted by Teema Boies Loeffelholz, and the November 25, 2013 FBI Forensic Interview with Rachael Happel. The Government argues that admission would be appropriate under both Rule 807, the residual hearsay exception, and as a prior consistent statement under Rule 801(d)(1)(B)(ii).

a.   <u>Rule 807 – Residual Hearsay Exception</u>

Under the residual hearsay exception, a hearsay statement will not be excluded if the following four conditions are met:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
>
> (2) it is offered as evidence of a material fact;
>
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
>
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Ev. 807. The Government submits that each element is met. For his part, Wilkinson argues that the interviews cannot be "more probative" than H.H.'s live testimony at trial, and that therefore, the interviews should not be admitted under the residual exception.

The Court finds that elements 1, 2, and 4 are satisfied.  The slightly more difficult question is whether the interviews are "more probative" than any other evidence than the proponent can obtain through reasonable efforts. The obvious contender for the "most probative" evidence is H.H.'s live testimony at trial. Nonetheless, the Government contends the interviews are "more probative" because they occurred within months of the alleged abuse, while it will be more than two years after the alleged abuse by the time H.H. testifies at trial. Dkt. 86, p. 9. In support of its argument, the Government cites to *Siuda ex. rel Siuda v. United States*, 2006 WL 335460 at *6 (E.D. Cal. Feb. 20, 2006).

In *Siuda*, the defendant focused its argument only on the trustworthiness element of Rule 807, and did not dispute that the young plaintiffs' videotaped interviews were "more probative" than any other evidence. The district court stated: "The videotapes are arguably *the most* probative evidence on the issue of abuse since the statements were made close in time to the alleged events, rather than five years later at the time [plaintiffs'] depositions." *Siuda*, at *7. But not only is *Siuda* an unreported and non-controlling case, it can be easily distinguished. First, the question discussed in *Siuda* is which is more probative – videotapes taken close in time to the alleged events, or testimony given five years later at a *deposition*. Here of course, the interviews are not being compared to deposition testimony, but rather to H.H.'s live testimony at trial. Second and relatedly, the *Siuda* order was issued at the summary judgment stage, and no mention was made of the possibility that plaintiffs would or would not eventually testify at trial. The Court is not willing to conclude that simply because the interviews were

taken closer in time to the alleged abuse than at the point in which H.H. will testify, that those interviews are somehow more probative than in-person testimony at trial.

And indeed, the Government is not, of course, requesting that the interviews be admitted in lieu of H.H.'s live testimony; rather, it seeks to admit the interviews *in addition to* H.H.'s trial testimony. If H.H. testifies as expected, admitting the interviews would be needlessly cumulative and thus not permitted under Rule 403. If, however, H.H. does not testify as expected—if her testimony is hesitant or inconsistent, or if she ends up being unable or unwilling to testify—then the Court would be inclined to admit the interviews pursuant to the residual exception. Should that scenario occur, the interviews may very well be the "most probative" evidence.

  b.  <u>Rule 801(d)(1)(B)(ii) – Prior Consistent Statement</u>

Pursuant to Rule 801(d)(1)(B)(ii), a statement is not hearsay if (1) the declarant testifies and is subject to cross-examination about a prior statement; (2) the statement is consistent with the declarant's testimony; and (3) the statement is offered to rehabilitate the declarant's credibility as a witness when attacked on another ground. Prior to a 2014 amendment to the Rule, only consistent statements offered to rebut charges of recent fabrication or improper motive were substantively admissible. But with the addition of subpart (ii), consistent statements that rebut other attacks on a witness—for example, "charges of inconsistency or faulty memory"—may be given substantive effect by the jury. *See* Fed.R.Ev. 801 Ad. Comm. Notes.

The Court will reserve ruling on the admissibility of the interviews under this rule. If the defense attacks the credibility of H.H. on cross examination, which is likely, then

the Court will be inclined to admit the portion of the interview that would rehabilitate H.H.'s credibility. The Court is mindful that admitting the interviews or portions thereof must satisfy the strictures of Rule 403, and will take up that analysis on an as-needed basis at trial. The Court will not permit the Government to introduce needlessly cumulative evidence, but so long as the three requirements under the Rule are satisfied and the probative value outweighs any unfair prejudice, the evidence will be admitted.

### (4) The Government's Motion to Admit Evidence of Defendant's Flight

The Government seeks to introduce evidence of Wilkinson's flight from law enforcement in Idaho and to Utah (1) as evidence of his consciousness of guilt; and (2) as direct evidence of the interstate travel elements of the crimes charged. Wilkinson did not file a response to the Government's motion to admit such evidence.

a. Evidence of Consciousness of Guilt

"Evidence of flight is generally admissible as evidence of consciousness of guilt and of guilt itself." *U.S. v. Harris*, 792 F.2d 866, 869 (9th Cir. 1986). Flight instructions are appropriate only when "there is evidence sufficient to support a chain of unbroken inferences from the defendant's behavior to the defendant's guilt of the crime charged." *U.S. v. Silverman*, 861 F.2d 571, 581 (9th Cir. 1988). Those four inferences are as follows: "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." *Id*. Accordingly, the Court must look for facts that support each inference. The Court finds that each of the four inferences are justified here.

First, Wilkinson fled when law enforcement arrived at his place of employment looking for him and when he drove to Utah in a vehicle he obtained from his neighbor but did not register in his name. Second, Wilkinson was aware of the charges against him, since he had already been arrested and charged in May of 2013. *See United States v. Hernandez-Miranda*, 601 F.2d 1104, 1107 (9th Cir.1979) (upholding flight instruction where defendant had been arraigned and had pled guilty prior to fleeing and, therefore, knew about the charges against him). Third, Wilkinson would have known through his counsel that the Lincoln County prosecutor was considering refiling charges against him, pending the results of the forensic search of his electronic devices. Additionally, consciousness of guilt concerning the crime charged could be inferred because Wilkinson took evidence of his crimes with him to Utah. Fourth and finally, the jury could reasonably infer actual guilt based on Wilkinson's flight from his employer's and subsequent drive to Utah in his neighbor's vehicle. Accordingly, the Government will be allowed to introduce evidence of flight as evidence of Wilkinson's consciousness of guilt. The Court will reserve ruling on how to instruct the jury regarding this evidence.

b.  Direct Evidence of the Interstate Travel Elements

Counts One, Two, and Five of the Indictment all require a nexus to interstate commerce. Dkt. 85, p. 7. Thus, evidence of Wilkinson's travel to Utah is relevant and admissible as to the interstate transportation elements of the crimes charged.

The Government also seeks to introduce evidence leading up to Wilkinson's travel to Utah, including the following: his efforts to sell his house and obtain a truck not registered in his name, his flight from the Rock Creek Grill when law enforcement

**Memorandum Decision and Order - 26**

arrived there looking for him, and his departure from his stepfather's house after he learned that law enforcement had been there looking for him. The Court concludes that this evidence is "inextricably intertwined" with Wilkinson's travel to Utah and therefore admissible.

Again, there are two categories of cases in which other act evidence has been determined to be inextricably intertwined with the charged crime such that the evidence need not meet the requirements of Rule 404(b). *United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1012 (9th Cir.1995). The first category is when other act evidence is "direct evidence, used to flesh out the circumstances surrounding the crime with which the defendant has been charged, thereby allowing the jury to make sense of the testimony in its proper context." *United States v. Ramirez–Jiminez*, 976 F.2d 1321, 1327 (9th Cir.1992). The second category is when other act evidence is admitted to offer a coherent and comprehensible story regarding the commission of the crime. *Id*. at 1012–1013.

Both categories are applicable here. The Government's proffered evidence would help the jury put Wilkinson's trip to Utah in context and create a coherent and comprehensible story regarding why Wilkinson was arrested in Utah and how he got there. Accordingly, the Government's motion to admit evidence of flight for both evidence of consciousness of guilt, and as direct evidence of the interstate travel elements of the crimes charged, is granted.

### (5) The Government's Motion to Admit Trade Inscriptions

The Government argues that Rules 801(c), 807, and 902(7) allow the admission of trade inscriptions found on Wilkinson's electronic devices and the hard drives contained therein.  Wilkinson did not file a response to the Government's motion.

Trade inscriptions, signs, tags, and labels "purporting to have been affixed in the course of business and indicating origin, ownership, or control" are self-authenticating, meaning "they require no extrinsic evidence of authenticity in order to be admitted." Fed. R. Evid. 902(7).  The Advisory Committee Notes identify several reasons why preliminary proof of authenticity is unnecessary: (1) risk of forgery is minimal; (2) trademark infringement involves serious penalties; (3) great efforts are devoted to inducing the public to buy in reliance on names; and (4) substantial protection is given them.  Fed. R. Evid. 902(7) Adv. Comm. Notes.

Here, the trade inscriptions read, "Made in Philippines," "Assembled in China," and "Product of China."  According to the Government, these "inscriptions and labels are relevant to show that the electronic devices have been mailed, shipped, or transported in or affecting interstate or foreign commerce[,]" which is an essential element of the offenses Wilkinson is charged with.  Dkt. 91 at 3.

The Court agrees.  These inscriptions are the quintessential inscriptions Rule 902(7) was designed to admit without extrinsic evidence of authenticity.  These inscriptions are highly relevant because they render the inference that the electronic devices were transported in interstate and foreign commerce more probable than it would be without the inscriptions.  Fed. R. Evid. 403.  In sum, the trade inscriptions are admissible pursuant to Rules 403 and 902(7).

**Memorandum Decision and Order - 28**

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that

1. The Defendant's motion in limine and request for *Daubert*/*Kumho* hearing (Dkt. 82) is GRANTED IN PART AND DENIED IN PART. The Court declines to exclude the testimony of Mydell Yeager at this point; however, the motion is granted insofar as an evidentiary hearing will be held to determine whether Ms. Yeager's testimony is sufficiently reliable under Rule 702.

2. The Government's motion in limine to admit other acts evidence (Dkt. 79 and 81) is GRANTED IN PART AND DENIED IN PART.

3. The Government's supplemental motion to admit other evidence, namely the computer-generated images, (Dkts. 88 and 89) is GRANTED.

4. The Government's motion in limine to admit recordings (Dkts. 86 and 87) is GRANTED IN PART AND DENIED IN PART.

5. The Government's motion in limine to admit evidence of Defendant's flight (Dkts. 84 and 85) is GRANTED.

6. The Government's motion in limine to admit trade inscriptions (Dkt. 91) is GRANTED.



DATED: October 21, 2015

B. Lynn Winmill
Chief Judge
United States District Court